IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 17, 2018 Session

**STATE OF TENNESSEE v. STEVE M. JARMAN**

**Appeal from the Circuit Court for Dickson County**
**No. 2015-CR-585   Larry J. Wallace, Judge**

_____

**No. M2017-01313-CCA-R3-CD**

_____

The Defendant, Steve M. Jarman, was convicted by a jury of voluntary manslaughter and received a sentence of five years to be served in the Tennessee Department of Correction. On appeal, the Defendant challenges: (1) the sufficiency of the evidence to support his conviction; (2) the admission of evidence of a prior assault charge for which the Defendant was acquitted and of prior threats against the victim's sister; (3) the admission of evidence of the Defendant's attempt to cash a check made out to the victim after the victim's death; (4) the admission of the victim's testimony in a prior trial as violating the Confrontation Clause; (5) and his five-year sentence to be served in confinement. We conclude that the trial court committed reversible error in admitting evidence of a prior criminal offense for which the Defendant was acquitted and evidence of the Defendant's prior threats against the victim's sister. Accordingly, we reverse the judgment of the trial court and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., J., joined. JAMES CURWOOD WITT, JR. J., filed a separate concurring opinion.

Olin J. Baker, Charlotte, Tennessee, for the appellant, Steve M. Jarman.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Ray Crouch, District Attorney General; and Carey Thompson and Brooke Orgain, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

Following the killing of the Defendant's girlfriend, Ms. Shelley Heath, the Defendant was charged with first degree premeditated murder, and the jury returned a guilty verdict for the lesser-included offense of voluntary manslaughter.

### The State's Proof

At 12:36 a.m. on April 18, 2015, the Defendant called 911, and an audio recording of the call was played for the jury. The operator asked the Defendant what happened, and the Defendant stated, "Look, I don't know. I've been asleep. My girlfriend got up and— oh my God—she pulled a gun at me and next thing I know the gun went off." The operator continued to ask questions about the victim's age, the victim's wound, and whether the weapon was still present. The Defendant answered each question and pleaded for help. The operator asked, "You said she shot herself?" There was a pause, and then the Defendant responded, "Yeah." The operator asked the Defendant to hold a clean cloth on the victim's wound, and the Defendant said, "Get somebody here, don't give me no instructions." The operator stated that help was on the way, and the Defendant explained that he had stepped outside for telephone reception and that he had to go back inside to aid the victim.

Deputy Steven Rychlik of the Dickson County Sheriff's Department responded to a report of a self-inflicted gunshot wound. Upon arriving at the residence, he found the Defendant and the victim on the living room floor in front of a recliner. Deputy Rychlik asked where the gun was located, and the Defendant responded that it was by the victim's head. Deputy Rychlik secured a pistol located on the floor beneath a side table near the recliner and immediately began CPR on the victim until EMS arrived. The victim was never responsive during that time.

The Defendant made a statement to Deputy Rychlik while on the scene. He explained that he and the victim had been at a friend's house that evening and that the victim had become intoxicated. When they returned home, he went to bed. He awoke when he heard two gunshots, ran into the living room, and noticed that the victim had shot herself. He pulled her onto the floor, began performing CPR, and called 911. He stated that the victim had suffered from severe depression and had previously attempted suicide.

Deputy Timothy Simmons also responded to the scene, and the Defendant repeated the same story to him. When the Defendant's father later arrived at the scene,

the Defendant again recounted his story. He added that he and the victim had been drinking moonshine, that the victim had been drinking it "like ice water," and that the victim fell asleep in the recliner after arriving home. On cross-examination, Deputy Simmons stated that the Defendant was distraught at the scene and appeared concerned about the victim. He agreed that the Defendant did not attempt to flee and was cooperative. Deputy Simmons did not observe any evidence of a struggle inside the residence.

Deputy Brian Cave was the third officer to arrive on the scene. He described the Defendant as excited and agitated. The Defendant repeated "over and over" the same statement that he gave Deputy Rychlik and Deputy Simmons. The Defendant told Deputy Cave that the victim was on medication that was not supposed to be taken with alcohol. Deputy Cave stated that the Defendant did not appear to have concern about the victim "per se" but "concern for what was going on." Deputy Cave's testimony was consistent with an audio and video recording of the Defendant's statements to Deputy Cave from Deputy Cave's body camera, which was played for the jury.

An audio recording and a written statement made by the Defendant on April 18 were admitted into evidence. The recording was played for the jury and was consistent with the Defendant's statements at the scene and with the Defendant's written statement.

Detective Jeff Lovell interviewed the Defendant on the day of the shooting and again on May 12, 2015. An audio recording of the May 12 interview was played for the jury, and a written statement consistent with the recording was entered into evidence. In the May 12 statement, the Defendant recounted that the victim was intoxicated when they returned home that evening, that she fell twice, that he put her in the recliner, and that she passed out. He maintained that he was asleep in the bedroom when he was awoken by the victim's making noise in the living room. Noticing his gun was missing from the bedroom, he went into the living room and saw the victim holding the gun. He stated that the hammer was already cocked and that the victim "kinda like point[ed] it at [him]." He said the victim turned the gun toward herself with "both hands on the handle." He reached to grab the gun, putting his hands over her hands. He tried to "jerk it back," and it went off. He was "pretty sure" his fingers were not on the trigger, and he believed the victim had one or both of her thumbs on the trigger.

The Defendant explained that he did not tell the truth at the scene of the shooting because he was afraid the officers would think they had been fighting. He clarified that he did not think the victim was truly pointing the gun at him but that she was moving it to point it at herself. He stated that "there's no way in the world" he would ever shoot or hurt the victim and that he was screaming at her, "What are you doing?"

- 3 -

Photographic evidence showed blood stains on the recliner and on the carpet near the recliner. One spent shell casing was found on the floor near the recliner. A second shell casing was found in a bedroom, but Detective Lovell explained that the casing was an "old one" and unrelated to the case. A fired bullet was found inside a container of Wonder Dust horse wound powder located inside a cabinet that was on the other side of the wall behind the recliner. On the nightstand of the bedroom were a gun holster, a knife, two magazines, and additional bullets. Bullet holes were located in the right arm of the recliner, in a wall behind the recliner, and on the side of a cabinet on the other side of the wall. Detective Lovell concluded that the bullet traveled from the front of the victim's body to the back of her body, through the arm of the recliner, through the wall, into a cabinet, and into the Wonder Dust container.

Detective Lovell used a dummy gun to demonstrate the ways a gun could have been held to result in such a trajectory. The demonstrations were not described for the record. Defense counsel likewise used the dummy gun to demonstrate other possibilities, which were not described for the record. On cross-examination, Detective Lovell acknowledged that the bullet trajectory was consistent with a theory where the Defendant entered the living room from behind the recliner, the victim turned to look at the Defendant, and the victim fired the gun while holding it in her left hand.

On redirect examination, Detective Lovell stated that his theory of how the gun was held when fired was inconsistent with the Defendant's May 12 statement. Detective Lovell did not think it would have been possible for the victim to shoot herself with the proper trajectory if she had been holding the gun in her right hand. He stated that when he tried to use the dummy gun while in that position, he did not have enough strength to pull the trigger. He concluded that the victim could not have shot herself.

Special Agent Rielly Lewis, a forensic scientist in the Tennessee Bureau of Investigation's ("TBI") microanalysis unit, conducted a gunshot primer residue analysis on a sample taken from the Defendant's hands. The results from the Defendant's sample were positive for gunshot residue, meaning the Defendant "could have fired, handled, or was near a gun when it fired." Special Agent Lewis also received a sample from the victim but did not test the sample. Special Agent Lewis explained that, pursuant to TBI policy, the TBI does not test samples from gunshot victims because gunshot residue is deposited on the victim when the victim receives the gunshot wound.

Deputy Mark Bausell testified that he was also present during the Defendant's May 12 interview and that the Defendant was aware that the gunshot residue swab had been taken from him prior to the interview. On cross-examination, Deputy Bausell testified that he did not believe the victim's gunshot wound could have been self-inflicted based on the angle of trajectory of the victim's entrance and exit wounds. Defense

- 4 -

counsel again made various demonstrations with the dummy gun, which were not described for the record, and Deputy Bausell agreed that it would have been possible for the victim to shoot herself in a position demonstrated by defense counsel.  On redirect examination, Deputy Bausell stated that it would have been very difficult for the victim to shoot herself in the position demonstrated by defense counsel due to the victim's size.  He agreed that the victim's alcohol consumption could have affected her motor skills, as well.

Dr. Thomas Deering, a forensic pathologist, presented expert testimony on the autopsy he conducted on the victim.  He noted that the victim had a gunshot wound to the chest, blood in her chest cavity, multiple blunt force injuries, pulmonary emphysema, and mild hypertensive cardiovascular disease.  He determined the cause of death was a gunshot wound to the chest.  The entrance wound from the bullet was located on the front left side of the victim's chest near her armpit, and the exit wound was located on the victim's back behind her right shoulder.  Dr. Deering determined that the bullet entered from the front of the victim, hit and fractured her left anterior ribs 2 and 3, went through her left lung, cut the aorta into two pieces, lacerated her esophagus, went through her right lung, fractured her right rib 4, and exited from her back.  Dr. Deering concluded that the victim bled to death as a result of the gunshot wound.  He clarified that the bullet went through the victim's body in a straight line and was not deflected by any bones or organs.  He stated that based on the location of the wound, it was possible the wound was self-inflicted, but he could not determine whether the manner of death was homicide or suicide.  He noted that the location of the wound was atypical from other suicide gunshot wounds in the chest he had previously observed.  He agreed that the location of the wound was consistent with homicide but could not conclude whether the manner of death was homicide or suicide.  Dr. Deering noted what appeared to be soot around the entrance wound, which indicated that the gun barrel was either very close to or touching the skin when it was fired.

Dr. Deering also requested that a toxicology report be conducted on the victim.  The report showed that the victim's blood alcohol content was .24 percent, which was triple the legal limit to drive in Tennessee.  The victim's blood also tested positive for benzodiazepine, an anti-anxiety medication.  Dr. Deering agreed that based on the level of alcohol in the victim's blood, the victim would have been intoxicated.  He explained that the combination of alcohol and benzodiazepine could cause an individual to become sleepy, could slow his or her ability to speak or respond, and could inhibit his or her motor control skills.  He explained that the effects a combination of drugs could have on an individual depend on that individual's tolerance and prior usage.

On cross-examination, Dr. Deering stated that anti-depressants contain a warning that the use of such medications may increase depression and suicidal tendencies.  He

denied that such a risk was associated with benzodiazepines. He agreed that combining alcohol and benzodiazepines could make an individual "more prone to suicide" due to the drugs' inhibitive natures. He agreed that, statistically speaking, most close-contact gunshot wounds are the result of suicide. On redirect examination, he said statistics also show that based on the location of the gunshot wound in this case, it was more likely homicide than suicide.

Mr. Paul Heath, the victim's brother, testified that the victim and the Defendant had lived together for four to five years. Mr. Heath lived with them for approximately two weeks before the victim's death. He explained that he had moved out before the day of the shooting. The victim wanted to move out of the residence six months prior to the shooting, so Mr. Heath told the victim that she could live with him once he received government assistance for housing. Mr. Heath said the Defendant was aware that Mr. Heath was moving out and had received his "housing papers." He stated that sometime prior to the shooting, the Defendant threatened to shoot Mr. Heath's sister, Ms. Stephanie Jackson, if she tried to pick up Mr. Heath from the Defendant's residence. In response, Ms. Jackson pulled onto a nearby road to pick him up rather than pulling into the Defendant's driveway. Mr. Heath acknowledged that the Defendant never threatened him.

Mr. Heath further testified about an alleged assault that the Defendant committed against the victim in 2013. Mr. Heath was at the Defendant's residence when he observed the Defendant choking and hitting the victim. He stated, "I s[aw] him … busting out his front door with his hands around her neck, slammed her down on the concrete, hit her in the face several times," and then "stomped" her in the face with his boots. He said the victim's face was bleeding and "looked bad," and he observed red marks on her neck. Mr. Heath stated that after the assault occurred, he handed his telephone to the victim, and she used it to call 911. The Defendant was arrested, and a trial was held. Mr. Heath explained that he did not testify at the assault trial because he never received a subpoena.

On cross-examination, Mr. Heath acknowledged that he had suffered head and neck injuries in a car accident, causing him to suffer some memory loss. He agreed that he did not remain at the Defendant's residence after the alleged assault because he mistakenly believed he had an outstanding warrant for his arrest. He acknowledged that both he and the victim had been drinking on the day of the alleged assault. He explained that the Defendant had given the victim a bottle of whiskey as a gift. Mr. Heath acknowledged that the victim denied the alleged assault during the assault trial, but he explained that the victim was lying to prevent the Defendant from going to prison. He acknowledged that the victim had a drug and alcohol problem for "some time" and that she had been taking medication for her mental health. He stated that he observed the

Defendant and the victim argue several times but that they "always made up." He agreed that the Defendant provided for the victim while the victim was out of work due to a broken leg. He also agreed that he reported to an officer that the Defendant would not let the victim touch the Defendant's gun. He acknowledged that both the Defendant and the victim had tempers.

Deputy Joseph Calhoun of the Dickson County Sheriff's Office testified that he responded to the 2013 report of a domestic incident in progress. When he neared the Defendant's residence, he observed the victim walking in the middle of the street. He stopped to speak with her, and she was crying and holding her ribs. The victim told Deputy Calhoun that she had been assaulted, and he observed lacerations on her right hand and "assaultive marks" on her neck. Deputy Calhoun described the red marks on the victim's neck as consistent with someone who had been choked. He stated that she appeared under the influence and smelled of alcohol. He did not speak to the Defendant about the allegations and was unable to contact Mr. Heath. Deputy Calhoun stated that the Defendant was charged with aggravated assault because the victim had reported he had choked her and restricted her breathing. Deputy Calhoun was present during the assault trial and noted that the victim's testimony at the trial differed from what she reported at the scene.

On cross-examination, Deputy Calhoun acknowledged that he transcribed the victim's statement, read it back to her, and had her sign it. He stated that he did not know whether the victim was drunk or taking any pills on the night of the alleged assault. He agreed that he was not present when the victim's injuries were sustained. On redirect examination, Deputy Calhoun opined that the victim's injuries did not appear self-inflicted. He testified that the victim did not make any statements regarding self-harm and that she appeared afraid of the Defendant.

A transcript of the victim's testimony during the 2013 assault trial was entered into evidence. During the trial, the victim testified that she and Mr. Heath had been drinking whiskey while the Defendant was sleeping in a back bedroom. At some point, the Defendant "came out of the bedroom hollering because [Mr. Heath] was being a little loud." The victim testified that she left the Defendant's residence because she "knew [she] was going to be kicked out" by the Defendant for waking him. The victim acknowledged speaking with Deputy Calhoun that evening. She told him that she had fallen off the porch because she was intoxicated, causing her to break her ribs. She stated that her hands were bleeding because she hit a window in an old door, which caused the window to break. When asked why she hit the window, she responded, "Probably out of anger. I'm not really sure." The victim stated that she was angry with the Defendant because "[she] hate[s] to be hollered at." She stated that she told Deputy Calhoun three

times she did not need an ambulance, but he called for one anyway. She agreed that she told Office Calhoun she was in pain.

The victim identified her signature on her written statement and testified that it was not a forgery. She claimed she did not remember signing the statement, and after the statement was read into evidence, she denied the allegations contained therein. In the statement, the victim reported that she and Mr. Heath were in the living room when the Defendant entered the room and began arguing with her. She said,

> While we were arguing, [the Defendant] grabbed me by my throat, restricting my breathing. I threw my arms up to attempt to get a breath and hit my hand on the front door. When I hit the front door, it busted a window in the door out. [The Defendant] then pulled me out of [the] chair and started kicking me in the ribs.

She estimated that the Defendant kicked her five or six times before leaving the residence.

On cross-examination at the assault trial, the victim denied that the Defendant punched, kicked, choked, dragged, or threatened her. She agreed that she had been "on a number of prescriptions" in addition to the whiskey she consumed that day. She acknowledged that her drug and alcohol use had affected her recollection of the events. She said the Defendant had previously told her that if she continued drinking, she would need to find another place to live. She agreed that she was angry with the Defendant because she was afraid he would throw her out of the house for drinking. She did not believe the phrase "restricting my breathing" used in her written statement was in her own words.

Ms. Stephanie Jackson, the sister of the victim and Mr. Heath, testified that the victim had been helping to care for Ms. Jackson's mother-in-law prior to the victim's death. She explained that the victim was recovering from a broken leg and that the victim had been receiving insurance settlement checks as a result. The victim received three checks: the first at the beginning of March 2015, for approximately $200; the second at the end of March 2015, for approximately $7; and the third on April 16, 2015, for approximately $1,800. Ms. Jackson stated that the victim suffered from depression "but not that bad of depression." She spoke to the victim on a daily basis but never heard the victim threaten to kill herself. She was aware that the victim drank alcohol and took anti-depressants. She stated that the victim was right-handed.

Ms. Jackson testified that she was aware the victim had planned on moving out of the Defendant's residence. A few days before the victim's death, the victim was at Ms.

Jackson's house when the victim received text messages from the Defendant, wherein the Defendant threatened to burn the victim's clothes. On the day before the victim's death, Ms. Jackson called Mr. Heath to tell him that he had received his housing voucher. During this phone call, she overheard the Defendant in the background. He threatened to shoot Ms. Jackson if she came to pick up Mr. Heath from the Defendant's residence. Ms. Jackson explained that she pulled onto a nearby street, that Mr. Heath walked to her car, and that the victim walked to her and gave her a hug before they left. She stated that the Defendant "always" wore a pistol on the side of his hip. She also stated that the victim called her on the day of her death. Mr. Jeffrey Proctor, a friend of the Defendant, took the telephone from the victim and would not give it back to her. During this conversation, Ms. Jackson heard the Defendant say, "[Y]ou get her over here and I'll take care of both of them." Ms. Jackson stated that she did not know what the statement meant.

On cross-examination, Ms. Jackson acknowledged that she had previously pled guilty to shoplifting. On redirect examination, she explained that her daughter did not scan a dress while going through a self-checkout register at Walmart and that she did not know her daughter was stealing the dress.

Ms. Reba Orndorff testified that she worked at a store where the Defendant would often cash checks. On April 21, 2015, the Defendant tried to cash a check that was in the victim's name. Ms. Orndorff informed the Defendant that she could not cash a check unless the person whose name was on the check was present. The Defendant claimed that the victim was "home on the couch or in bed with a broke[n] leg." Ms. Orndorff called her supervisor to confirm the policy, and her supervisor informed her that the victim was deceased. Ms. Orndorff did not ask the Defendant about the victim's death but again informed him that she could not cash the check. The Defendant said, "Okay," and left with the check. Ms. Orndorff described the Defendant as "calm" throughout the encounter.

Ms. Terrenda Duncan, the sister of the victim, Mr. Heath, and Ms. Jackson, testified that approximately two months prior to the victim's death, she spoke to the victim on several occasions about moving out of the Defendant's residence. She explained that the victim was recovering from a broken leg, that Mr. Heath had received government assistance for housing, and that Mr. Heath and the victim planned on moving in together. She agreed that an insurance settlement check would have helped the victim with the expense of moving into a residence with Mr. Heath. She also agreed that the victim's moving out "[a]bsolutely" would have upset the Defendant. On cross-examination, Ms. Duncan acknowledged that she and her siblings had filed a wrongful death suit against the Defendant for $10 million, which was subsequently dismissed. She denied holding a grudge against the Defendant as a result.

During the Defendant's May 12 statement to police, the Defendant explained that he attempted to cash the victim's insurance check to pay for her funeral expenses. He said the check never was cashed and that he may have thrown it away by mistake.

**Defense Proof**

The Defendant's friend, Mr. Proctor, testified that the Defendant and the victim were at his house on the day of the shooting, where they visited and drank moonshine. He stated that he and the Defendant shot guns that day. He did not notice any "fussing or bickering" between the victim and the Defendant. He agreed that he spoke with Ms. Jackson on the telephone but denied hearing the Defendant make any statement that he would "take care of both of them." Mr. Proctor did not sense any hostility between Ms. Jackson and the Defendant while on the telephone with Ms. Jackson. On cross-examination, he agreed he had previously told investigators that the victim did not appear drunk but "slightly buzzed" that day. He said he never heard the victim talk about killing herself. On redirect examination, Mr. Proctor stated that he did not recall the victim stumbling or falling. While the victim was at his home, he helped treat a "bad wound on [the victim's] arm" by putting gun powder on the wound and setting it on fire. He denied any knowledge of what had caused the wound on the victim's arm.

Ms. Connie Jarman, the Defendant's ex-wife, testified that she and the Defendant were married for ten years and that he was "a loving husband." She stated that the Defendant never assaulted her and that they remained friends after their divorce. She explained that the Defendant's second wife passed away and that she was not aware of the Defendant's ever putting his second wife "in any harm's way." She said the Defendant took care of his second wife until her passing. She agreed that harming a woman would be "[c]ompletely" out of character for the Defendant. On cross-examination, she acknowledged that she and the Defendant had been divorced for nearly twenty years prior to trial. She agreed that she did not have any personal knowledge of "what was going on between [the victim and the Defendant]."

After deliberating, the jury returned a guilty verdict of the lesser-included offense of voluntary manslaughter. A subsequent sentencing hearing was held, and the Defendant was sentenced to serve five years in incarceration. The Defendant timely appeals.

**ANALYSIS**

On appeal, the Defendant challenges the sufficiency of the evidence to support his conviction. He also asserts that the trial court erred in allowing evidence under Tennessee Rule of Evidence 404(b) regarding the alleged assault for which the Defendant

was acquitted, the text messages about burning the victim's clothes, and the threats against Ms. Jackson. He further asserts that Deputy Calhoun's testimony about the victim's statements regarding the alleged assault violates the Confrontation Clause. He argues that the trial court also erred in allowing evidence of his attempt to cash the victim's insurance settlement check after her death. Finally, he argues that the trial court abused its discretion in sentencing him to five years in incarceration.

## I. Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this court must determine whether the evidence is sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). The appellate court examines the relevant statute to determine the essential elements for the offense and analyzes the evidence admitted at trial to determine whether each element is adequately supported. *State v. Stephens*, 521 S.W.3d 718, 723-24 (Tenn. 2017) (citations omitted). The court determines "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 724 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The standard of review remains the same regardless of whether the conviction is based upon direct or circumstantial evidence. *Id.* (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)). "'[T]he State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom.'" *Id.* (quoting *State v. Harris*, 839 S.W.2d 54, 75 (1992)). This court does not reweigh the evidence. *Id.* (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). Instead, "'a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts' in the testimony in favor of the State." *Id.* (quoting *Harris*, 839 S.W.2d at 75). The conviction replaces the presumption of innocence with a presumption of guilt. *Id.* (citing *Evans*, 838 S.W.2d at 191). On appeal, the defendant has the burden of demonstrating why the evidence is insufficient to support the verdict. *Id.* (citing *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982)).

Although the Defendant was charged with first degree premeditated murder, the jury returned a guilty verdict for the lesser-included offense of voluntary manslaughter. When reviewing the sufficiency of the evidence of a lesser-included offense, this court must determine whether each element of the conviction is supported by sufficient proof. *State v. Parker*, 350 S.W.3d 883, 909 (Tenn. 2011); *see also Jackson*, 443 U.S. at 316 (1979). "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). A person acts intentionally

"when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a). A person acts knowingly "with respect to the conduct or the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." T.C.A. § 39-11-302(b). With respect to a result of a person's conduct, the person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." *Id.* The question of whether an act is committed under adequate provocation is a question of fact for the jury. *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995).

The only element challenged by the Defendant on appeal is the existence of adequate provocation. Viewed in the light most favorable to the State, the Defendant and the victim were both intoxicated and were known to have tempers. The Defendant told the 911 operator that he had been asleep when the victim "pulled a gun at [him]" and that the gun subsequently "went off." The Defendant's hands tested positive for gunshot residue. Based on the angle of trajectory of the bullet that killed the victim, Detective Lovell concluded that the victim could not have shot herself. Dr. Deering explained that based on statistics regarding the location of the gunshot wound, the wound was more likely the result of homicide rather than suicide. The victim was right-handed, but the wound entered near her left armpit. The evidence presented at trial established that the Defendant and the victim had an acrimonious relationship. While this circumstantial evidence of a fight between the victim and Defendant is far from overwhelming and while the Defendant also presented inconsistent stories in which he claimed that the victim shot herself either while he was asleep or as he attempted to wrestle the gun from her, the jury is the ultimate arbiter of fact.

We conclude that, based on the Defendant's statement to the 911 operator that the victim pointed the gun at him and on the evidence that the death was a homicide, a rational juror could have found beyond a reasonable doubt that the Defendant shot the victim as a result of adequate provocation. *See State v. Paul Galbreath*, No. 01C01-9406-CC-00204, 1995 WL 518878, at *4 (Tenn. Crim. App. Sept. 1, 1995) (holding evidence was sufficient for voluntary manslaughter where the victim pointed a gun at the defendant following an exchange of heated words); *see also State v. Jarquese Antonio Askew*, No. M2014-01400-CCA-R3-CD, 2015 WL 9489549, at *8 (Tenn. Crim. App. Dec. 5, 2015) (holding evidence of adequate provocation was sufficient where circumstantial evidence of a fight or argument existed). The Defendant is not entitled to relief on this ground.

## II. Tennessee Rule of Evidence 404(b)

The Defendant challenges the admission of evidence of the alleged 2013 assault of which the Defendant was acquitted; Ms. Jackson's testimony regarding the text messages

the victim received from the Defendant wherein the Defendant threatened to burn the victim's clothes; and the testimony regarding the threats Ms. Jackson overheard while on the telephone.

## A. Evidentiary Hearing

Prior to trial, the Defendant filed motions in limine to exclude evidence of his prior threats against Ms. Jackson and the alleged 2013 assault, of which the Defendant was acquitted. A hearing was held to determine what evidence could be admitted under Tennessee Rule of Evidence 404(b).

Mr. Heath testified consistently with his trial testimony. He added that on the day of the alleged assault, he had fallen asleep but was awoken by the Defendant "yelling and screaming" at the victim about the fact that Mr. Heath and the victim had drank the entire bottle of whiskey the Defendant had given the victim. Mr. Heath stepped onto the porch for better telephone reception, and then the Defendant and the victim came out of the door with the Defendant's hands around the victim's neck, choking her. The Defendant then hit the victim with his fists a few times and "boot stomped" her in the face. Mr. Heath said he did not intervene because he was disabled.

Mr. Heath acknowledged that in the two weeks he lived with the victim and the Defendant prior to the victim's death, he did not observe the Defendant assaulting the victim. He said he heard the Defendant threaten to shoot and kill the victim, but he did not recall the specific dates the threats were made. While he never heard the Defendant threaten the victim regarding her desire to move out, he heard the Defendant threaten their sister, Ms. Jackson. He stated that the Defendant overheard Mr. Heath speaking with Ms. Jackson on the telephone about his impending move and that the Defendant threatened to "shoot [Ms. Jackson's] vehicle up if she pulled up in his driveway." Mr. Heath interpreted this as meaning the Defendant would shoot Ms. Jackson.

Mr. Heath acknowledged that he had three prior domestic assault charges, that he had been drinking the day of the alleged assault, and that he suffered memory problems due to a car accident. He explained that he did not believe the Defendant was a threat because "he recanted his story" after making the threat against Ms. Jackson.

Deputy Calhoun testified consistently with his trial testimony regarding his response to the alleged 2013 assault and added the victim appeared "very upset" after the alleged 2013 assault and that she told him she had gotten into a verbal argument with the Defendant.

- 13 -

Ms. Duncan testified consistently with her testimony at the trial that the victim expressed her desire to move out on multiple occasions, that the victim was waiting for her last insurance settlement check, and that the victim planned on moving in with Mr. Heath to help take care of him.

Ms. Jackson testified consistently with her trial testimony regarding the threats she overheard the Defendant make against her. Nothing was mentioned regarding the text messages the victim received from the Defendant threatening to burn the victim's clothes.

The trial court determined that both of the Defendant's threats against Ms. Jackson were material to show motive and intent. The court determined that although the danger of unfair prejudice was high, it did not outweigh the probative value. The court explicitly credited the testimony of Ms. Jackson and determined that clear and convincing evidence established that the Defendant made the threats.

The trial court also found that the Defendant's prior alleged assault was material to show motive and intent. The court determined that the probative value was high and that the danger of unfair prejudice did not outweigh the probative value. The court found that although the Defendant was acquitted of the assault charge, the testimony presented at the evidentiary hearing supported the assault by clear and convincing evidence. The trial court accordingly allowed the State to present evidence regarding the threats against Ms. Jackson and the prior alleged assault.

### B. Analysis

Tennessee Rule of Evidence 404(b) makes inadmissible evidence of other crimes, wrongs, or acts "to prove the character of a person in order to show action in conformity with the character trait." Evidence of other acts may be admissible for non-propensity purposes, such as "to establish motive, intent, identity, absence of mistake, or common plan or scheme," or "contextual background." *State v. Little*, 402 S.W.3d 202, 210 (Tenn. 2013); *see* Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Such evidence may be admissible under Rule 404(b) where the following conditions are satisfied:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

- 14 -

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

This rule has been described as a rule of exclusion rather than inclusion. *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014). The rationale supporting the rule is "that the admission of other wrongs carries with it the inherent risk of the jury convicting a defendant of a crime based upon his or her bad character or propensity to commit a crime, rather than the strength of the proof of guilt on the specific charge." *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008). When a trial court substantially complies with the procedure mandated by Rule 404(b), as was the case here, we review its decision to admit or exclude evidence under the rule for abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). A trial court abuses its discretion when "'it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in injustice to the complaining party.'" *Jones*, 450 S.W.3d at 892 (quoting *State v. Adams*, 405 S.W.3d 641, 660 (Tenn. 2013)).

### 1. Prior Assault Trial

The Defendant argues that the trial court erred in allowing evidence of the alleged prior assault, of which the Defendant was acquitted. He specifically asserts that the acquittal rendered the evidence less than clear and convincing and that the probative value did not outweigh the danger of unfair prejudice. The State responds that the proof presented in the evidentiary hearing was clear and convincing, or alternatively, that any error in admitting the evidence of the alleged assault was harmless. We conclude that binding precedent required the exclusion of the evidence and that the error in admitting the evidence was not harmless.

"The clear and convincing standard is more exacting than preponderance of the evidence but less exacting than beyond a reasonable doubt, and it requires that 'there [be] no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Jones*, 450 S.W.3d at 893 (quoting *State v. Kennedy*, 152 S.W.3d 16, 18 (Tenn. Crim. App. 2004)). The State has the burden of establishing by clear and convincing evidence that a prior crime was committed by the defendant. *Id.* (citing *White v. State*, 533 S.W.2d 735, 743 (Tenn. Crim. App. 1975)).

The Tennessee Supreme Court has held that evidence of a prior acquittal is simply not admissible under Tennessee Rule of Evidence 404(b). The Court explained:

In such a case the effect of the acquittal is to render less than "clear and convincing" the proffered evidence that the defendant committed the prior crime and the probative value of such evidence cannot be said to outweigh its prejudicial effect upon the defendant. For such evidence to have any relevance or use in the case on trial, the jury would have to infer that, despite the acquittal, the defendant nevertheless was guilty of the prior crime. No such inference can properly be drawn from an acquittal, particularly from an acquittal based on insufficient evidence to sustain a guilty verdict....

*State v. Holman*, 611 S.W.2d 411, 413 (Tenn. 1981). Observing that a defendant would have to defend himself against the charge of which he had been acquitted, the Court concluded that such evidence "should not be admitted." *Id*. Accordingly, this court has held that "evidence of a crime for which the defendant was acquitted can never be admissible as evidence of a prior crime in a trial, despite its relevance on issues other than propensity." *State v. Shropshire*, 45 S.W.3d 64, 75-76 (Tenn. Crim. App. 2000).

More recently, however, the Tennessee Supreme Court has noted that "the holding in *Holman* represents a minority rule among the states." *Little*, 402 S.W.3d at 214. In *Little*, the defendant was tried for several charges, and the trial court determined that the State had not presented sufficient evidence to allow two of the charges to be considered by the jury. *Id.* at 208. The defendant suggested that the introduction of evidence regarding the charges of which the trial court acquitted him violated the rule in *Holman*. *Id.* at 208-09. The Tennessee Supreme Court concluded that because the case concerned joint charges rather than a prior acquittal, the *Holman* rule did not apply. *Id.* at 213 n.6. Nevertheless, the Court noted that most jurisdictions do not follow a blanket exclusion rule but permit consideration of prior acquittals, with some jurisdictions requiring that the fact of acquittal be presented to the jury. *Id.* at 214 n.7. While the Tennessee Supreme Court observed that *Holman* was a minority rule, it concluded that "these issues are best left for another day when the viability of the *Holman* rule and the admissibility of evidence of a prior crime for which the defendant was acquitted are properly presented for review." *Id.*

In its analysis, the *Little* Court noted that Tennessee, unlike other jurisdictions, requires clear and convincing evidence of the prior bad acts. *Id.*; *see* Tenn. R. Evid 404(b)(3); *see also Huddleston v. United States*, 485 U.S. 681, 689 (1988); *United States v. Bell*, 516 F.3d 432, 441 (6th Cir. 2008) (noting that the federal government need not demonstrate by a preponderance of the evidence that the acts occurred but only that the jury could reasonably conclude that the acts occurred). Clear and convincing evidence is nevertheless a lower standard than proof beyond a reasonable doubt. *Jones*, 450 S.W.3d

at 893. Accordingly, it is possible for proof to meet the clear and convincing evidence standard but fall short of the requirements of proof beyond a reasonable doubt. *See Dowling v. United States*, 493 U.S. 342, 345-351 (1990) (concluding that crime of which the defendant was acquitted was not barred by Federal Rule of Evidence 404(b) because "acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof"); *Shropshire*, 45 S.W.3d at 76 n.8 (noting that *Holman* is a minority position and that the standard of proof for a conviction is higher than that for admitting evidence under Rule 404(b)). While *Little* implies that the Tennessee Supreme Court may revisit *Holman*, we conclude *Holman* remains binding precedent, and under *Holman*, we determine that the evidence regarding the assault of which the Defendant was acquitted was admitted in error.

The State acknowledges the binding precedent in *Holman* but argues that the error was harmless. An error in admitting evidence under Rule 404(b) is subject to harmless error analysis, and thus, relief is available only where the "error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); *see Jones*, 450 S.W.3d at 900 (applying this standard where the trial court erred in admitting evidence under Rule 404(b)). This analysis "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct. To the contrary, the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making." *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008) (citations omitted).

We conclude that the error was not harmless in this case. In *State v. Tony Edward Bigoms*, this court held that a defendant was entitled to a new trial after a TBI agent testified regarding the agent's testimony in a prior murder trial for which the defendant was acquitted. No. E2015-02475-CCA-R3-CD, 2017 WL 2562176, *1 (Tenn. Crim. App. June 7, 2017), *no perm. app. filed.* Although the agent only testified about his own testimony at the prior trial and about the defendant's presence at the trial, this court determined that the jury could infer that the defendant was also the defendant in the prior trial and "that whatever the [d]efendant was previously on trial for … was a serious offense." *Id.* at *24. This court held that the agent's testimony, coupled with the prosecutor's arguments emphasizing the testimony and the circumstantial evidence presented, constituted error that was not harmless. *Id.*

Here, more than a mere inference of the Defendant's prior crime was admitted. Instead, Mr. Heath testified in detail regarding the alleged assault, and Deputy Calhoun testified regarding his observations of the victim following the assault and regarding the victim's statement, which she later recanted. This essentially turned into another trial on the Defendant's alleged assault, for which he had already been acquitted. Based on the

vast amount of highly prejudicial evidence concerning the alleged assault that was admitted and the circumstantial evidence presented at trial, we determine that the error more probably than not affected the outcome of the trial. *See Holman*, 611 S.W.2d at 413 (granting a new trial where evidence of a prior offense with substantially similar facts was admitted despite the fact the defendant had been acquitted of the offense); *Shropshire*, 45 S.W.3d at 76 (granting a new trial in light of the "almost identical" facts from the prior crime and "the possible prejudicial effect of introducing evidence of a crime for which a defendant was acquitted"). We will address the additional issues raised by the Defendant so as not to pretermit them. *See State v. Parris*, 236 S.W.3d 173, 189 (Tenn. Crim. App. 2007).

## 2. Prior Threats

The Defendant challenges under Rule 404(b) the admission of Ms. Jackson's testimony regarding the text messages the victim received wherein the Defendant threatened to burn the victim's clothes, the Defendant's threat to shoot Ms. Jackson, and the Defendant's threat to "take care of both of them." The State asserts that the Defendant waived his challenge to the testimony regarding the text messages and that the trial court did not abuse its discretion in admitting the testimony regarding the threats Ms. Jackson overheard while on the telephone.

The Defendant argues that the State failed to proffer evidence regarding the text messages in the evidentiary hearings, that the trial court did not follow the procedural requirements of Rule 404(b) as a result, and that Ms. Jackson's testimony regarding the messages accordingly should have been excluded. Ms. Jackson did not testify about the text messages until trial, but the Defendant failed to object to her testimony. The Defendant did not move for a mistrial or otherwise attempt to remedy the unexpected testimony. This issue is waived. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *State v. Kiser*, 284 S.W.3d 227, 289-90 (Tenn. 2009) (holding a Rule 404(b) challenge was waived when defendant failed to specifically object to statements at issue even though defendant filed a motion in limine regarding any Rule 404(b) evidence).

The Defendant also asserts that the trial court erred in allowing Ms. Jackson to testify regarding the Defendant's threats she overheard while on the telephone. He argues that there was not clear and convincing evidence that these threats occurred, that the threats were not probative for any elements of the lesser-included offense of voluntary manslaughter, and that any probative value was outweighed by the danger of unfair prejudice.

- 18 -

The trial court determined that the Defendant's threats against Ms. Jackson were material to show motive and intent. Although evidence tending to show motive and intent are generally admissible, *Goedel v. State*, 567 S.W.2d 180, 182 (Tenn. Crim. App. 1978), such evidence must still be relevant under Tennessee Rule of Evidence 401. Prior bad acts demonstrating the relationship between a victim and a defendant are relevant "to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993); *see also State v. Turnbill*, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982); *State v. Glebock*, 616 S.W.2d 897, 905-06 (Tenn. Crim. App. 1981).

For the threats against Ms. Jackson to support the theory that the Defendant's motive for killing the victim was to stop her from leaving, one must infer that the Defendant was aware the victim wanted to move out and that the victim was waiting for Mr. Heath to receive his housing assistance and to find a new residence in order for the victim to move with him. Although bad acts against a third party can be relevant where there is a link between such acts and the offense at hand, *see State v. Moss*, 13 S.W.3d 374, 384 (Tenn. Crim. App. 1999) (holding it was not error to admit evidence of prior bad acts against the defendant's daughter to show motive and intent in killing his wife where there was a link between the bad acts and the defendant's motive to regain access to his daughter), we conclude any link between threats against the victim's sister and the victim's death is speculative and too far removed to be relevant. *See State v. Joseph Caronna*, No. W2013-00845-CCA-R3-CD, 2014 WL 6482800, at *40 (Tenn. Crim. App. Nov. 18, 2014) (finding error where relevance of defendant's financial crimes to defendant's motive to kill the victim was "extremely speculative"); *State v. Raymond Bailey*, No. W2004-00512-CCA-R3-CD, 2005 WL 1215965, at *6 (Tenn. Crim. App. May 20, 2005) (finding error where relevance of defendant's drug use weeks after alleged offense occurred to show motive was "speculative at best"). We acknowledge that the second threat against Ms. Jackson referred to "both of them" and not just Ms. Jackson specifically. However, no context is given as to whom the defendant was referring, and Ms. Jackson herself testified that she did not know the meaning of this statement.

Moreover, the trial court acknowledged the high prejudicial effect of these threats but determined that the probative value outweighed any prejudice. We disagree and determine that any remote probative value is greatly outweighed by the high prejudicial effect in this case. We further conclude that although this error alone may have been harmless, when viewed in conjunction with the erroneous admission of the prior alleged 2013 assault, the error in admitting these prior threats is not harmless.

### III. The Confrontation Clause

The Defendant challenges the admission of Deputy Calhoun's testimony regarding statements made by the victim to him on the day of the alleged assault in 2013 as violating the Confrontation Clause. *See generally Crawford v. Washington*, 541 U.S. 36 (2004). The State responds that the Defendant waived this issue by failing to raise it in his motion for new trial. Although the Defendant raised the confrontation issue during the pretrial evidentiary hearings, he did not raise it in his motion for new trial, and the issue has therefore been waived. *See* Tenn. R. App. P. 3(e); *Parker*, 350 S.W.3d at 900 (holding a confrontation issue is waived when defendant failed to raise it in a motion for new trial and declining to review for plain error).

### IV. Tennessee Rules of Evidence 401 and 403

The Defendant challenges the admission of evidence relating to his attempt to cash the victim's check following her death. Tennessee Rules of Evidence 401 and 403 govern the general admissibility of evidence. Evidence must be relevant to be admissible. Tenn. R. Evid. 402. Relevance is defined as "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. "[U]nfair prejudice is '[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *DuBose*, 953 S.W.2d at 654 (quoting *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978)). We review the admissibility of evidence pursuant to these rules for abuse of discretion. *State v. Biggs*, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing *DuBose*, 953 S.W.2d at 652).

The Defendant was charged with first degree premeditated murder, which requires the State to show that the killing was premeditated and intentional. *See* T.C.A. § 39-13-202(a)(1) (2014). Premeditation can be inferred from circumstances surrounding the offense. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006). Here, the primary issue was whether the Defendant acted intentionally with premeditation or whether the victim's death was the result of suicide or by accident. Evidence establishing a motive for the crime can be relevant to demonstrating premeditation. *Adams*, 405 S.W.3d at 663. The victim had received a large check days before the Defendant shot her, but she was planning to leave the Defendant and use the check to move in with her brother. The Defendant's attempt to cash the victim's check following her death was relevant and highly probative regarding whether the Defendant acted intentionally. We conclude that

the probative value was not substantially outweighed by the danger of unfair prejudice. The trial court did not abuse its discretion, and the Defendant is not afforded relief on this ground.

## V. Sentencing

The Defendant argues that the trial court abused its discretion in weighing the applicable enhancement and mitigating factors and in denying alternative sentencing. The State responds that the trial court did not abuse its discretion, and we agree.

### A. Sentencing Hearing

A presentence report was introduced into evidence at the sentencing hearing, which indicated that the Defendant had prior criminal charges but no convictions. The report also reflected that the Defendant self-reported his twice daily marijuana usage from 2004 until June 2016. The Defendant reported that he used cocaine twice per year from the age of twenty-five until 2010. He was prescribed a variety of pain pills, including Lortab, oxycodone, and Percocet, in 1996 but continued using such drugs until 2010, even when he no longer had prescriptions for the drugs.

Ms. Duncan provided a statement regarding the effect the loss of her sister had on her family.

Mr. Clyde Tony Jarman, the Defendant's father, testified that the Defendant had always maintained full-time employment with an exception of a few months after the Defendant broke his hip. He described the Defendant as a good father to his two adult children, one of whom had started her own part-time business and one of whom had finished college and was studying abroad as a Fulbright Scholar. Mr. Jarman explained that the Defendant's mother had dementia and had suffered recent falls. Mr. Jarman stated that he had health problems and that he needed the Defendant's help to get to the doctor and take care of the Defendant's mother. He testified that the Defendant lived near him and helped him around the house "all the time." He did not know if the Defendant had any prior convictions. He agreed that he paid the Defendant's initial bond and that the Defendant had been in jail for about six months after the conclusion of the jury trial.

On cross-examination, Mr. Jarman agreed that the Defendant's son was approximately six years old when the Defendant and the son's mother were divorced and that the son primarily lived with his mother following the divorce. He explained that the Defendant lived with Mr. Jarman and the Defendant's mother and that the Defendant's children would visit him every other weekend. He acknowledged that the Defendant had

been arrested several times. He was not aware that the Defendant was charged with driving under the influence when he was nineteen or twenty years old.

Upon examination by the trial court, Mr. Jarman explained that the Defendant's having the victim around "was the problem." He said he warned the Defendant, "[Y]ou're going to end up in jail with her." The trial court asked Mr. Jarman about the Defendant's self-reported marijuana usage, and Mr. Jarman stated that he had previously smelled marijuana on the Defendant but that he never saw the Defendant smoking it. Mr. Jarman was unaware of the Defendant's prior cocaine usage. He was aware that the Defendant had taken pain medication after breaking his hip, but he did not know whether the Defendant had prescriptions for the medication.

The trial court considered the presentence report, placing specific emphasis on the Defendant's self-reported drug usage. The court determined the Defendant's continued drug use indicated a pattern of behavior. The trial court applied three enhancement factors: that the Defendant had a significant amount of prior criminal behavior; that the victim was particularly vulnerable because she was under the influence of alcohol; and that the Defendant employed a firearm during the commission of the offense. *See* T.C.A. § 40-35-114(1), (4), (9). The court applied four mitigating factors, but gave each factor less weight than the enhancement factors: that the Defendant acted under strong provocation because the court believed he and the victim were intoxicated, under the influence of drugs, fighting, and arguing; that substantial grounds existed tending to excuse or justify the Defendant's conduct; that the Defendant committed the offense under such unusual circumstances that is was unlikely a sustained intent to violate the law motivated the criminal conduct; and the catch-all factor, focusing on the Defendant's prior full-time employment, his assistance to his father, and his success in raising his children. *See* T.C.A. § 40-35-113(2), (3), (11), (13). The trial court sentenced the Defendant as a Range I offender to a within-range sentence of five years. *See* T.C.A. §§ 39-13-211(b); 40-35-112(a)(3).

The trial court determined that the Defendant was statutorily a favorable candidate for alternative sentencing. The court held that the Defendant had a significant criminal history, which continued even after being released on bond, and that confinement was necessary to avoid depreciating the seriousness of the offense. The trial court accordingly ordered the Defendant to serve his five-year sentence in the Tennessee Department of Correction.

## B. Analysis

On appeal, the Defendant challenges the length of his sentence and the trial court's denial of alternative sentencing. A trial court's sentencing decisions are generally

reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing. *State v. Bise*, 380 S.W.3d 682, 707-08 (Tenn. 2012); *see State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (holding that the grant or denial of alternative sentencing is also reviewed for abuse of discretion). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). This court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. The trial court is "to be guided by – but not bound by – any applicable enhancement or mitigating factors when adjusting the length of a sentence." *Id.* at 706. The "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." *Id.* The appealing party has the burden to show that the sentence was improper. *State v. Cooper*, 336 S.W.3d 522, 525 (Tenn. 2011).

In determining the sentence, the trial court must consider: (1) any evidence received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) the evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b) (2014). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(4), (5).

A defendant is eligible for probation if the sentence imposed is ten years or less. T.C.A. § 40-35-303(a) (2014). A trial court may deny alternative sentencing when:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1). "When considering probation, the trial court should consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's background and social history, the defendant's present condition, including physical and mental condition, the deterrent effect on the defendant, and the best interests of the defendant and the public." *State v. Brian Allen Cathey*, No. E2015-01284-CCA-R3-CD, 2016 WL 2641766, at *3 (Tenn. Crim. App. May 6, 2016) (citations omitted). The court should also consider the defendant's truthfulness. *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983).

The Defendant challenges the trial court's weighing of the applicable enhancement and mitigating factors in determining his sentence length. This court will only disturb the discretion given to the trial court's weighing of enhancement and mitigating factors where such determination "wholly departs" from the purposes and principles of sentencing. *Bise*, 360 S.W.3d at 706. Here, the trial court considered the statutory criteria and facts supported by the record. Given the presumption of reasonableness granted to within-range sentences, we conclude that the five-year sentence was consistent with the purposes and principles of sentencing.

The Defendant also challenges the trial court's denial of alternative sentencing. Although the trial court properly determined that the Defendant was a favorable candidate for alternative sentencing, the court was not bound by such determination. *See* T.C.A. § 40-35-102(6)(A), (D). To deny alternative sentencing solely on the basis of the need to avoid depreciating the seriousness of the offense, "'the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree, and the nature of the offense must outweigh all factors favoring a sentence other than confinement.'" *State v. Trotter*, 201 S.W.3d 651, 654 (Tenn. 2006) (quoting *State v. Grissom*, 956 S.W.2d 514, 520 (Tenn. Crim. App. 1997)). However, this heightened standard of review does not apply where the trial court bases its denial of alternative sentencing on more than one of the factors listed in Tennessee Code Annotated section 40-35-103(1). *State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014) (order, per curiam). Here, the trial court held that confinement was appropriate due to the Defendant's history of criminal conduct and to avoid depreciating the seriousness of the offense. *See* T.C.A. § 40-35-103(1)(A), (B). The record supports the determination that the Defendant had a long history of criminal

conduct, including continued long-term use of illegal drugs, which did not cease even after the victim's death. We accordingly discern no abuse of discretion in sentencing the Defendant to serve his five-year sentence in confinement.

## CONCLUSION

Based on the foregoing, we reverse the judgment of the trial court and remand the case for a new trial for voluntary manslaughter.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE